J-S42017-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WARREN STOKES | : | |
| | : | |
| Appellant | : | No. 3373 EDA 2018 |

Appeal from the PCRA Order Entered October 25, 2018
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002680-2015

BEFORE: PANELLA, P.J., OLSON, J., and MUSMANNO, J.

MEMORANDUM BY OLSON, J.: **FILED OCTOBER 21, 2020**

Appellant, Warren Stokes, appeals from an order entered on October 25, 2018, which dismissed his petition for collateral relief filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546. We affirm.

On a previous appeal, this Court accurately summarized the relevant facts of this case as follows.

> On August 5, 2009, Katora Wilson Bush travelled by bus to the 5100 block of Chester Avenue in Southwest Philadelphia[, Pennsylvania following] dinner with her daughter, Amirajh Wilson, and her husband, Gerald Bush. Upon disembarking the bus, all three observed an African-American teenager in a black hooded sweatshirt, later identified as [Appellant's] co-defendant Marquise C. Walker-Womack [("Walker-Womack")], following them as they walked southwest along Chester Avenue.
>
> As she travelled home with her family, Katora Wilson Bush observed her son . . . Niam Wilson Atif [("Victim")], at the corner near 5117 Chester Avenue talking to his neighbor Allen Bryant. During Bryant['s] and [Victim's] discussion about employment, an unidentified individual walked past the pair shouting, "it's about to go down." Seconds later, Bryant saw the African-American

teenager in the black hooded sweatshirt approach [Victim] from behind, draw a revolver, and shoot him three times.

\*\*\*

At approximately 11:00 p.m., Philadelphia Police Officers Alexander Montes and Clara Martinez arrived at the scene and observed [Victim] lying in a pool of blood emanating from a large wound in the back-right side of his head. [Victim was subsequently pronounced dead and his death ruled a homicide.]

\*\*\*

No more than one week after the murder, [Appellant] bragged to . . . Kareem Pittman [("Pittman")] and Tayale Shelton[ ("Shelton"), members of a gang known as the Harlem Boys,] that [Walker-Womack] "put in some work" by killing [Victim]. [Appellant] and [Walker-Womack] told both Pittman and Shelton that [Appellant] provided the .38 Special [Walker-Womack] used to kill [Victim]. As [Walker-Womack] described the shooting to Pittman, [Appellant] displayed the firearm used to murder [Victim]. [Walker-Womack] further informed Shelton that he shot [Victim] at [Appellant's] behest.

On October 7, 2009, Philadelphia police engaged in a foot chase with Tyreek Artis, a member of the Harlem Boys gang. Artis led police to an apartment complex at 5403 Harley Terrace and attempted to conceal himself in unit 3A. Unit 3A served as an epicenter for gang-related activity, housing several firearms and approximately [60] drug packets prepared for distribution. Inside, police discovered Artis, Pittman, and [Appellant], and recovered a loaded .38 special revolver.

Officer Jesus Cruz, a ballistics expert with the Philadelphia Firearms Investigation Unit, examined all three projectiles recovered from [Victim's] body and determined that all three bullets were fired from a single firearm. Each projectile exhibited "six left twist" rifling markings, an identification characteristic used to match a projectile to the weapon that fired it. Officer Cruz concluded that the projectiles were consistent with having been fired from the .38 Special recovered at 5403 Harley Terrace, as the firearm exhibited "six left twist" characteristics.

On October 6, 2010, federal authorities indicted Pittman and Shelton pursuant to the Racketeering Influenced and Corrupt Organizations Act ("RICO"). Prior to trial, Pittman and Shelton

pled guilty and entered into separate cooperation agreements. During an April 18, 2012 interview with Philadelphia Homicide Detectives John McNamee and William Kelhower, Pittman explained that [Appellant] oversaw a splinter organization within the Harlem Boys, known as the Greenway Gorillas, consisting primarily of adolescent members, and that [] Walker-Womack, known in the organization as "Littleman," shot [Victim] at [Appellant's] behest. During a May 18, 2012 interview, Shelton told Detectives McNamee and Kelhower that [Walker-Womack] confessed to shooting [Victim] on [Appellant's] orders, as [Appellant] had been "beefing" with [Victim] for some time prior to the shooting. Shelton further explained that the murder weapon was a community firearm that multiple gang members had access to and that [Appellant] provided it to [Walker-Womack].

[Both Pittman and Shelton testified during Appellant's trial. During their testimony, they stated that Walker-Womack was] a member of the Greenway Gorillas, which [Appellant], as a member of the Harlem Boys, oversaw. Pittman and Shelton both testified that Greenway Gorilla[] members seeking to advance within the gang committed murder to impress Harlem Boys associates. [In addition, Pittman and Shelton stated that Walker-Womack murdered Victim to earn Appellant's approval.]

Appellant and [] Walker-Womack together were . . . convicted of [first-degree murder, conspiracy, carrying a firearm without a license, carrying a firearm in public in Philadelphia, and possessing an instrument of crime]. On April 29, 2016, the trial court sentenced Appellant to an aggregate life sentence (comprised of mandatory life without parole for first-degree murder, concurrent sentences of six to [12] years for conspiracy and one to two years for carrying a firearm without a license, and no further penalty on the remaining two charges).

*Commonwealth v. Stokes*, 2017 WL 2964691, at *1-2 (Pa. Super. July 12, 2017) (unpublished memorandum).

This Court affirmed Appellant's judgment of sentence on July 12, 2017. *Id*. Appellant did not seek further review. Instead, on July 10, 2018, Appellant filed a timely PCRA petition. Appellant's PCRA Petition, 7/10/18, at

1-5. In his petition, Appellant raised various claims of ineffective assistance of trial counsel. *Id.* The PCRA court held a hearing on September 27, 2018. That same day, however, the PCRA court issued notice that it intended to dismiss Appellant's PCRA petition in 20 days without further proceedings, as it concluded that Appellant's claims lacked merit. PCRA Court Order, 9/27/18, at 1; *see also* Pa.R.Crim.P. 907(1). Appellant did not file a response. The PCRA court dismissed Appellant's petition on October 25, 2018. PCRA Court's Order and Opinion, 10/25/18, at 1-12. This timely appeal followed.[1]

Appellant raises the following issues on appeal:

Did the [PCRA] court err and abuse its discretion when [it] dismissed [Appellant's] PCRA petition?

I. [Whether] [t]rial counsel rendered ineffective assistance for failing to object [to the testimony of Assistant United States Attorney ("AUSA") Katayoun Copeland as impermissible bolstering?]

II. [Whether] [t]rial counsel was ineffective for not objecting [to the trial court's jury instruction?]

_____

[1] Appellant filed a notice of appeal on November 26, 2018. *See* 1 Pa.C.S.A. § 1908 ("Whenever the last day of any [filing] period shall fall on Saturday or Sunday, or on any day made a legal holiday by the laws of this Commonwealth or of the United States, such day shall be omitted from the computation."). The PCRA court did not order Appellant to file a 1925(b) concise statement of errors complained of on appeal. Because Appellant's counsel failed to file a brief on his behalf, despite being ordered to do so, this Court remanded the case on two separate occasions to determine whether Appellant's counsel abandoned him. *See* Order, 6/10/19, at 1; Order, 9/23/19, at 1. Both times, the trial court determined that appellate counsel did, in fact, abandon Appellant, and appointed new counsel. *See* Response to Order, 7/5/19, at 1; Response to Order, 10/22/19, at 1. Current appellate counsel entered his appearance on November 1, 2019, and filed an appellate brief with this Court on March 2, 2020.

Appellant's Brief 5 and 11-12.

Our standard of review is as follows:

As a general proposition, an appellate court reviews the PCRA court's findings to see if they are supported by the record and free from legal error. Th[is C]ourt's scope of review is limited to the findings of the PCRA court and the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party.

*Commonwealth v. Hammond*, 953 A.2d 544, 556 (Pa. Super. 2008)

(citations and quotations omitted).

Further,

to establish a claim of ineffective assistance of counsel, a defendant "must show, by a preponderance of the evidence, ineffective assistance of counsel which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Commonwealth v. Turetsky*, 925 A.2d 876, 880 (Pa. Super. 2007) (citation omitted). The burden is on the defendant to prove all three of the following prongs: "(1) the underlying claim is of arguable merit; (2) that counsel had no reasonable strategic basis for his or her action or inaction; and (3) but for the errors and omissions of counsel, there is a reasonable probability that the outcome of the proceedings would have been different." *Id*. (citation omitted).

We have explained that

[a] claim has arguable merit where the factual averments, if accurate, could establish cause for relief. *See Commonwealth v. Jones*, 876 A.2d 380, 385 ([Pa.] 2005) ("if a petitioner raises allegations, which, even if accepted as true, do not establish the underlying claim . . ., he or she will have failed to establish the arguable merit prong related to the claim"). Whether the facts rise to the level of arguable merit is a legal determination.

The test for deciding whether counsel had a reasonable basis for his action or inaction is whether no competent

- 5 -

counsel would have chosen that action or inaction, or, the alternative, not chosen, offered a significantly greater potential chance of success. Counsel's decisions will be considered reasonable if they effectuated his client's interests. We do not employ a hindsight analysis in comparing trial counsel's actions with other efforts he may have taken.

Prejudice is established if there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

*Commonwealth v. Stewart*, 84 A.3d 701, 707 (Pa. Super. 2013) (some internal quotations and citations omitted).

"[B]oilerplate allegations and bald assertions of no reasonable basis and/or ensuing prejudice cannot satisfy a petitioner's burden to prove that counsel was ineffective." *Commonwealth v. Paddy*, 15 A.3d 431, 443 ([Pa.] 2011). Moreover, "[a] failure to satisfy any prong of the ineffectiveness test requires rejection of the claim of ineffectiveness." *Commonwealth v. Daniels*, 963 A.2d 409, 419 ([Pa.] 2009) (citation omitted).

*Commonwealth v. Sandusky*, 203 A.3d 1033, 1043–1044 (Pa. Super. 2019), *appeal denied*, 216 A.3d 1029 (Pa. 2019) (parallel citations omitted).

In his first issue, Appellant argues that trial counsel was ineffective for failing to object to AUSA Copeland's testimony. Appellant claims that the Commonwealth's case "depended almost exclusively on the trustworthiness of the testimonies of [] Pittman and Shelton." Appellant's Brief at 18. As such, Appellant argues that trial counsel provided ineffective assistance by not objecting to AUSA Copeland's testimony because her "sole purpose" was to "bolster and enhance" Pittman and Shelton's credibility. *Id.* at 17. Appellant's claim lacks merit.

As our Supreme Court previously explained, "[the prosecution] commits improper bolstering when it places the government's prestige behind a witness through personal assurances as to the witness's truthfulness, and when it suggests that information not before the jury supports the witness's testimony." *Commonwealth v. Reid*, 99 A.3d 427, 447 (Pa. 2014). The prosecution, however, must "fully disclose any offers of leniency, and the failure to do so could [] result[] in a new trial." *Id.* (citation omitted). Therefore, simply "referenc[ing] that a plea agreement requires truthfulness does not constitute improper vouching." *Id.* (citation omitted).

Herein, AUSA Copeland testified during Appellant's trial and disclosed that the United States Attorney's Office, with regard to a federal investigation, offered both Pittman and Shelton a "cooperation plea agreement." N.T. Trial, 2/4/16, at 23. AUSA Copeland then disclosed the terms of the agreement. Specifically, she stated:

> In order for us [to] offer them a plea, a cooperation plea agreement, we have to -- we draw the conclusion that based upon what they've told us as compared to our investigation, as compared to our ongoing investigation, that what they are telling us is an accurate depiction of not just one or two things, but about everything that they know. And, thereafter, they are, in fact, being honest and truthful with us before we determine that we're going to offer them a plea agreement.
>
> ***
>
> So, in essence, the plea agreement lays out, as I -- apparently you have seen – anything and everything that we have promised them and they in turn promise to us.

They agree to plead guilty to the offenses which they were charged with. In fact, they pled to all the offenses with which they were both charged.

They agree to be truthful and honest in [] every meeting that they have with us and in the interviews that they have with us and any interview that they have with anybody and any testimony that they provide in any courtroom in any setting.

They agree to make themselves available for interviews with us, with investigators.

They agree that they have to be truthful about absolutely anything and everything that they know and any crimes about which they are asked, and that truthfulness continues, that request and requirement for their truthfulness continues, not only up until the point of plea, but even thereafter and even after sentencing.

They -- in return, we advise them that if they are, in fact, truthful from the beginning of their communication with us up until the conclusion, at any point in time that they have -- they're asked questions by us – that they must be truthful.

And if they are, in fact, and they meet that burden, we let them know that we make the decision as to whether or not they have been truthful.

And if they've been truthful, then they will get from us something called departure motions, a motion that will allow the [c]ourt to depart from the guidelines, the guidelines that they face, their prison sentences that they face, and also to depart from the mandatory minimum.

They are told that the outcome of any proceeding in which they testified doesn't matter. It's not whether or not an individual is found guilty or not guilty which dictates what their sentences will be. It is, in essence, whether or not they were truthful from the beginning until the end.

*Id.* at 24-26. AUSA Copeland also stated that Pittman and Shelton testified previously and that their "plea agreements were still in effect." *Id.* at 27. The two witnesses, however, both admitted during Appellant's trial that neither of them had undergone sentencing yet. N.T. Trial, 2/3/16, at 37 and 217.

Upon review, we conclude that AUSA Copeland's testimony did not constituted improper bolstering. Not once during AUSA Copeland's testimony did she personally assure the jury that Pittman and Shelton testified truthfully during Appellant's trial. Instead, she simply disclosed that "the federal government offered Pittman and Shel[t]on cooperation plea offers after reviewing their statements and comparing their recollection with additional evidence they discovered over the course of their investigation." PCRA Court Order and Opinion, 10/25/18, at 7. The mere fact that AUSA Copeland explained that the plea agreement "require[d] truthfulness" does not constitute impermissible bolstering. *Reid*, 99 A.3d at 447. Accordingly, Appellant's trial counsel was not ineffective for failing to object to her testimony.

In his second issue, Appellant argues that trial counsel was ineffective for failing to object to the trial court's jury instructions. Upon review, we conclude that Appellant's claim lacks merit.

"[I]t is an unquestionable maxim of law in this Commonwealth that a trial court has broad discretion in phrasing its instruction, and may choose its own wording so long as the law is clearly, adequately, and accurately presented to the jury for its consideration." *Commonwealth v. Antidormi*, 84 A.3d 736, 754 (Pa. Super. 2014) (citations omitted). Thus, jury instructions will not be found in error if, taken as a whole, they adequately and accurately set forth the applicable law. *Commonwealth v. Daniels*, 963 A.2d 409, 410 (Pa. 2009).

Herein, Appellant's claim revolves around the prosecutor's statement during the Commonwealth's closing argument, as well as the trial court's subsequent instruction regarding the prosecutor's statement. Specifically, during the Commonwealth's closing argument, the prosecutor attempted to demonstrate the credibility of certain Commonwealth witnesses by pointing to the lack of evidence that refuted their testimony that Appellant and Walker-Womack made inculpatory statements to them. The prosecutor for the Commonwealth stated:

> What benefit at that point, what benefit at that point to lie? Because regardless of whether it's the truth or not, you know what is going on out on the street and in prison to a snitch. I don't have to tell you that.
>
> But what if you lie? What's the risk of lying? What's the risk of lying?
>
> If [the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF")"] or the federal agents or the Homicide detectives or the US Attorney, or my office, me, Homicide detectives, if we find out, "Wait, Little Man. Little Man? Well, actually he was in Atlantic City at the time. He was on a video at a Wawa."

N.T. Trial, 2/5/16, at 54-55. Walker-Womack's counsel objected, which resulted in the following exchange.

> [Walker-Womack Counsel]: Objection, Your Honor.
>
> [The court]: I think what he's -- I'm going to overrule it. I think what [the Commonwealth] is trying to do is give examples of not what's in evidence --
>
> [The Commonwealth]: Right.
>
> [The court]: -- but to suggest --
>
> [The Commonwealth]: Why.

- 10 -

[The court]: -- an inference.

[The Commonwealth]: Thank you.  I apologize for interrupting.

*Id.* at 55.  Following closing arguments, the trial court issued jury instructions. In doing so, the trial court provided a thorough explanation of the presumption of innocence, as well as the Commonwealth's burden of proof, and then the court stated:

> So, to summarize in this regard, you may not find either defendant guilty based upon a mere suspicion of guilt.  The Commonwealth has the burden of proving the defendant guilty beyond a reasonable doubt.  If the Commonwealth has met that burden, then the defendant is no longer presumed to be innocent, and you should find him guilty.
>
> On the other hand, if the Commonwealth has not met its burden, then you must find him not guilty.
>
> I just want to point out, when there was an objection during the Commonwealth's closing, he was giving examples of how he wanted you to assess the credibility of the witnesses, and said – he gave you some what-ifs that possibly could have happened.  I just want to highlight.  That was not in [any way] an attempt to shift the burden because the defendants have no burden.  He was just talking about possible scenarios in which he wanted to argue that the witnesses, the cooperators, federal cooperators could be proven to be lying.  But it's just important that you understand, these defendants have no obligation to present testimony, and Mr. Sax was not in any way suggesting that.

*Id.* at 101-102.  Appellant now claims that, by making this statement, the trial court provided an "unsolicited curative instruction" and "reinforced the propriety of the prosecutor's closing argument."  Appellant's Brief at 20-21. As such, Appellant argues that trial counsel provided ineffective assistance by not objecting to the trial court's instruction as "improper."  *Id.* at 21.

Upon review, we conclude that Appellant's claim lacks merit. By giving the aforementioned instruction, the trial court attempted to ensure that the jury understood that the burden of proof rested with the Commonwealth and that Appellant, as the defendant, did not have any obligation to present testimony or evidence on his behalf. *See Commonwealth v. Loccisano*, 366 A.2d 276, 283 (Pa. Super. 1976) ("Because it is the Commonwealth's burden to persuade the jury of defendant's guilt, the defendant is not required to present any evidence in order to prevail.") Thus, the trial court "clearly, concisely, and accurately stated the law" and Appellant's claim to the contrary lacks merit. PCRA Court Opinion, 10/25/18, at 11.

Because Appellant is not entitled to relief for either of his claims, we affirm the PCRA court's order dismissing his PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/21/2020

- 12 -